Richard Weinstock, and I represent the appellant and plaintiff in this case, Eugenio Banuelos. Now, I've been listening in court. I've heard a lot of law about police cases, and now I'm going to switch your mind to ERISA, which is a totally different area of law. I think the cases have been very thoroughly briefed. I would like to reserve some time for rebuttal. I just want to go over the facts of this case, just to get your mind into the ERISA. I think we've got the facts. I'm concerned about the case that says – I was looking for the name of the case, but the case that says if you have a summary of a plan and it conflicts with the plan itself, that the best reading for the beneficiary under ERISA will be used. Do you understand where I'm going? Yes, I do. In this case, we have the plan, and then through whatever means, a draft or whatever document goes out that says that you're vested in five years, whereas the plan says ten. That's obviously a conflict. What significance or what can we take from this case with regard to that document that got in your hands that showed that the plan had been amended, I believe, in 1999 or 1994, to show the five years? In other words, is this something of a reliance? Is it an act, even though it was, if it was or was not final, that should bind? And as I understand it, we're on summary judgment and a denial of summary judgment. That's correct. So in that framework, how do I look at that document in regard that it says five years you're vested and that the plan says ten? In this posture of summary judgment. I think you have to look at that document as if it were the summary plan description, as if it were the master plan document, as if it were binding in the case. And the reason for that is the document was, after all, created by the trustees. It was created by the plan. If they made errors, it's really in their, the ball is in their court. They are in the position to make sure that information that goes into a document like that is correct. They are in a position to make sure that if there is a document like that and it contains incorrect information, it shouldn't go out. Once it's gone out, it's really telling the world, telling employees, telling participants in a plan, this is the plan. These are the rights you have under the plan. Okay. Let's put it into context here. This is under the motion for denial of motion for summary judgment. If the district judge made an error of law, we can review that under these circumstances, right? Yes, I believe so. Okay. Is this an error of law in his judgment? Because he went further. He said, gee, I don't know what this document is. We're going to explore this. And eventually did, by going to trial, explore the whole thing. So how do we put your case in an error of law situation with regard to this document? I think the answer to that is that as a matter of law, based upon the facts presented at the summary judgment motion, plaintiff should have won because the document has the same status as a summary plan description and as any other master plan document. Okay. Then you can find one final question. What were the facts that are not disputed facts? Because, again, we're in summary judgment. What were the facts you're going to rely on to make that determination of an error of law? Okay. I think the facts were, let me go through them one by one. Let's call it the June 1994 plan or document. That was distributed to a participant who had requested it. It happened to be my client. It was distributed pursuant to an official request for documents pursuant to what ERISA says you're supposed to do to get documents. My review of the record indicates that's correct. That is, you didn't create the document. You asked for the plan. You didn't say, I want a specific document. You asked for the plan and included in the request for the plan, you got this piece of paper. That's correct. Okay. That's correct. That's point number one. Point number two, look at that document. Look at the plan. Where does it say that it's anything other than the plan as it exists in June of 1994? There's nothing to warn anybody that there's anything wrong with this plan. As I remember the record also, there's no denial that it was produced by them. It was the subsequent act of the district judge to go in, where did this come from or what it was. They don't deny that it was produced by them. And nowhere that I could see on the document it says draft, tentative or whatever. Is that correct? That's correct. So we're just looking at documents now. Okay. I'm sorry to interrupt you. Oh, let me ask a question while you're being challenged. What document did the trustee rely on when he made the decision in this case? That is a good question because I'm really not sure. They relied on, first of all, they went into the mistake theory. There are two theories that they are trying to sell here. One is. Yeah, but when he made the decision against your client or said he had to do 500 more hours or whatever. Right. What was the trustee looking at at that time? At that time the trustee was looking at provisions of the plan, as I understand it, if you don't lose all your credits because of these breaks and services and you turn 65, your credits are kind of frozen because under RESA, after you turn 65, you can't have any forfeiture. That's my understanding. So his credits, my client's credits are frozen at six years. I believe it really should be seven, but that's beside the point. They're frozen at six years, but he has a break in service before he turns 65. Actually, he has a number of breaks in service, mainly because he can't get any work after he turns 62. But he has all these credits that have been built up and he has a break in service. Now, the plan says, goes on to say, well, if you work 501 more hours, all your credits are restored, and therefore those credits are useful. So the way the plan and, in fact, the RESA law now reads is that forget about the 10-year requirement. If you have, let's say, five years, even before they pass the modifications, if you have five years at the time you turn 65, you get credits because, as I understand it, you cannot forfeit those credits. You have a break in service, let's say, at the time you turn 65. You get your pension with five years of credit under that. Now, is that based on the plan that you have in your hands or the plan that the trustee had in its hands when it decided it? Well, I think that plan is, that part of it is also in the 1994 plan. It's right in there that that would occur. Or wait, I have to take that back. I believe there was a subsequent amendment that mirrored a provision in RESA that said that would have to happen. If you have, if you turn 65 and you only have, say, five or six years of credits, even four, then your credits are frozen. But reading the plan, actually both plans, if you have a break in service, let's say when you're 64, then according to them and according to the plan, you have to work that 501 hours to get that pension. I don't know. Judge Fletcher is right on the issue here. If you freeze at 65 with six years with the breaks, what do you get as a pension? Or do you have to come up to 10 years? See, I'm not too sure what the 10 years means or the five years in the amendment on vesting means when you say that the credits are frozen, because if they're frozen at four, do you get anything? You apparently, you would get something. But the problem is that if between, let's say, let's take a hypothetical. As I understand the plan, let's say you have four or five, let's say you have four years of credit at the age of 63. And then from 64 to 65, you don't earn anything. So you have a break in service. You have a break in service. Under the plan, it says in order for those four years to be rehabilitated, you've got to work 501 hours. Now, that's the way the plan is written. I can't explain particularly why, other than ERISA says, yes, you can write a 501-hour work requirement. Well, let's assume you did work the 501. Do you get four years' worth of benefits? My understanding is you do. And, in fact, I have had clients who have pensions with four years of credit because they happen to work from the age of 64 to 65. It's a matter of how much. Does it mean that if they change the vesting from 10 to 5, you would get a full pension at 5, then, versus a reduced pension? Is that it? Well, not quite. There are really two sort of thresholds here. One is when do you vest? Okay. Okay, once it's decided that you're best vested, you go to the second part of the equation, which is, well, now how much do you get? Now, vesting credit is computed different than benefit credits. Okay? So if you only worked five years, you wouldn't get a full pension. My client is only trying to get a couple hundred bucks a month because he didn't work 10 years. He's not entitled to it under the pension. He hasn't earned sufficient benefit credits for that. If I can go back to addressing the last part of your question, how do you know or what's the issue of law as far as why Judge Kelleher below should have been bound by it? The final, I think, nail in the coffin for the defendant here is we submitted this particular provision. We quoted it. We cited it. If there was a mistake there, why wasn't it caught at that level? If they had some explanation in the summary judgment motion, which they did not, other than, well, we just didn't catch it, then maybe they would have an issue to go to trial. But it's sort of like a triple whammy here. You get the document. You requested it pursuant to an official request. It doesn't say anything on it. It looks just like what would be a proper ERISA document. And then you quote it in a below at a hearing, an administrative hearing. And you say, okay, five years. And they don't tell you anything. All they say is pension denied. Goodbye. Go to federal court. So it just seems patently unfair that they can put out a document like that, make all these errors, and then have a trial on something called a mistake issue. I might also add that this document for another client. That's correct. Now, I'm just curious. What work did your client do? I mean, I know he belonged to the union, but what? He was a construction laborer. If you drive the freeways, you drive the streets and you see the people out there with jackhammers, with shovels, you know, whatever. Okay. That's what they do. When did he start doing this work? He actually started doing this work in 1966. So you'll notice there's a finding of fact by the judge in the trial that he worked in this trade for 25 years. Now, you say, well, how is it that a guy who worked in a trade like this for 25 years just doesn't automatically get a pension? Well, the provisions of the pension and, in fact, ERISA are very stringent on vesting credits. You have to work 1,000 hours in a year to get a vesting credit. Admittedly, many of those years he couldn't get enough work to work the 1,000 hours. He tried, but it's a union hiring hall situation, and maybe he was at the bottom of the list as far as being able to go out for work. He managed to get his six years, we're arguing seven years, of 1,000 hours or more, and here he is, no pension. The bottom line, if we can rely on that document as being the plan for five years, does he still have to work another 510 hours before he can get that much credit to get a pension? No. The document saves him from having to work the 501 hours, the June 1994 document, because it specifically says that if you have five years of credit, you get your pension when you turn 65. Even with the deductions? Because he had something like six or something, I can't remember. Yes. Okay. That's kind of what I thought, too, but you filled in the blanks for me on how this would all work. Thank you. Now, what would you ask us to do, to remand it to the district court, to remand it to the trustee, or just to grant him his pension? I would ask that you grant him his pension. I don't think there's a need to remand it to the district court because this really is simply an issue of law that we're presenting. The documents are there. It was presented at summary judgment motion. There was no contest that the documents said what they said and so forth. So I think the court should simply say that he is entitled to his pension. I think if he were to send it back, for example, to the trustee, I don't think they're going to give him his pension. You know, I think they've already stated in their papers that he's not entitled to it. So it would simply be futile to do that. But we don't know what document they were relying on. If we sent it back to the trustee and say this is the document, rule on it, what would happen? If you sent it back and said you must rule on the June 1994 document, yes, if your decision were that, this is a valid ERISA document and therefore we're going to remand and we find that this is, as a matter of law, the document in the case and summary judgment should be granted, then technically I don't think they could, they would have any other recourse. Maybe there is something else lying in that document that I haven't seen, but I could see that as a possible favorable outcome for my client. Let me ask you this. Judge Kelleher making his decision, he went outside the administrative record, didn't he? Yes, he did. Now, does he have, I mean, does he have jurisdiction to do that? In this kind of case, no. I think that in an ERISA case there are some precedents for going outside the record, and I'll name the two that I can recall off the top of my head. One is if you're going for a de novo review. But that didn't apply in this case because, remember, there was a hearing below in the administrative hearing level in which the trustees had full discretion to make decisions. So de novo would be one. And aside from de novo review, I don't think that there is any authority in an ERISA case to go outside the record. And you do de novo review if you found a conflict of interest that is substantial. Is that when we go outside? Pardon? Do we do de novo review when we found a substantial conflict of interest? Yes. That's another situation when there's a conflict of interest also. Thank you. Are you saying we should do a de novo review in this case? No. Okay. Okay. We're just talking about this. Okay.  Okay. If there's no further questions, I will be back for rebuttal for whatever time I have. Thank you. All right. Good morning, Your Honors. Charles Notaman on behalf of Appellee Construction Libraries Pension Trust for Southern California. I'd like to ask you a couple of questions. What – I don't know if you know the answer to this or not, but what percentage of the laborers, the members of the union, what percentage of them get pensions by the time they get to be 65? I don't know the answer to that, Your Honor. It's not as – I worked as a construction laborer. I'm aware of that. And it was hard work, and I don't – they didn't have all the services and stuff, but usually the people that are there, you know, they're younger people, they're in their 20s, 30s, and people in their 40s or 50s, this kind of work is hard for them to take, and so you don't see too many of them around. But I'm wondering, here people are making all these contributions, you know, when they're young, but they never – my guess is just a small number of them ever reach the point where they've got these – where they're eligible, you know, five years or ten years. So I just wonder what's going on here. Well, Your Honor, this issue was explored in the Canseco case, which was tried by Judge Takasugi years ago, in which I participated, and there was a challenge to the vesting requirements of the Construction Laborers' Pension Trust. And eventually Judge Takasugi ruled in a pre-ERISA context that the plan needed to reduce its vesting requirements because such a small number of laborers were qualifying. That was then appealed to this Court, and this Court upheld that decision. So in a pre-ERISA context, that issue has been vetted and dealt with by this Court. That's the Canseco case, which is cited on our papers, not for this proposition, but for purposes of establishing the proper standard of review. In the post-ERISA context, of course, we're dealing with a federal statute that tells us what we are permitted to do in terms of vesting. And this case involves a defined benefit plan, which is a different creature than a defined contribution plan. Under a defined contribution plan, the employee always gets what's been contributed. In a defined benefit plan, the very nature of the beast is some will qualify and some will not. In this case, Mr. Banuelos did not qualify under the rules that were in the plan, which were designed, and I do believe mirror, ERISA's vesting requirements, including the things you've been asking questions about, how many years are required how many hours are required per year, that's 1,000 hours. If you earn less than 1,000, you have a one-year break in service. And once you have a one-year break in service, the plan is not required. It could, but the plan is not required to recognize credits that were earned prior to that one-year break in service. And that's what happened here. If we were to apply the 1994 plan as we define it, would he be entitled to benefits? No, I don't think so, Your Honor. That's an issue that was really never decided by the court below, and the reason for that is Mr. Weinstock has this what I'll call rogue plan document, which I'll go into in a minute, which he obtained in representing a different participant, by the way. And he never got a plan document in this case, never asked for it in discovery or otherwise. That's not really my question. I understand. I understand all that. But even if you look at Section 4.07e as contained in the plan, which we believe never became part of the plan. Let's just talk about that plan. Let's not derogate it for the moment. Under that plan, would he or would he not qualify? We don't believe he would qualify even under Section 4.07e contained in that plan, Your Honor, because if you read it, while it is not – while it's worded kind of awkwardly, it says in Clause 3 that the participant not have had a break in service during the period referred to in Clause 1. So you have to look at that amendment to understand what I'm saying. During that period in Clause 1, we believe Mr. Banuelos did have a break in service. Okay? This one-year break is defined under ERISA. And under both ERISA and the plan, the trust is entitled to disregard those years of service unless and until he works 501 hours. That is not affected by the vesting provision in the plan that says you vest at age 65. You are vesting at age 65 to conditional credits, the condition being that you have to work 501 hours. We can never take those away. If he goes back to work for 501 hours even next year, he still gets his pension, but he still has to satisfy that condition. Well, Judge Fletcher is right on the issue because we asked counsel for Mr. Banuelos the same question. He said, no, he doesn't have to satisfy the 501. So apparently both of you disagree. I don't know what that has to do when we analyze what happened in the denial of summary judgment, but apparently there's a disagreement here about what this document does and what the plan does. There is, Your Honors. And for that reason, if this Court were to rule that somehow the 1994 plan, as it's been described, is binding, my belief is that this should be remanded to the trustees to determine whether Mr. Banuelos would qualify under the 1994 pension plan. It would require another de novo determination by the plan with regard to the plan in these new circumstances. Is that it? Well, it's not de novo. We, I believe. I mean, another review. Yes, another review. Then Judge Fletcher also asked another good question. So what did the plan rely upon when it denied his, which element of the plan or which version of the plan, if you will, did they rely on when they denied the benefits when he applied? It's a good question and one, unfortunately, that is very difficult to answer. The trustees had the same document in their records that Mr. Weinstock was given. Now, I want to clarify that, too. And they were there for a long time, apparently. Pardon me? They were there for a long time. Because they didn't even know it was there until it was brought to their attention. In the summary judgment setting, isn't it true that this document was there for a long time and until it was brought to their attention that they said, oops, there it is. So it was there for a long time. That's correct. Okay. And they acted on it. No, they didn't act on it. That's what is kind of strange about this. Is Mr. Banuelos, I mean, Mr. Weinstock sent. What were they looking at when they came up with the 501 hours? Well, they were looking at the terms of the plan. I don't think they actually sit down and look at the plan document in connection with making these determinations, Your Honor, unless there's a reason to. Both the administrator and the trustees are familiar with the terms of the plan because they've gone through the process of implementing the amendments over a period of time and they know how it works. When it gets complicated, they turn to legal counsel and say, what do we do? We don't understand what we do. But I'm very confused that we can't say what they were looking at when they made the decision. Well, there's nothing in the records to indicate what they were. You know, we know what their decision was. How did they get to it? They got there because Mr. Banuelos had numerous one-year breaks in service prior to the time he reached age 65. And that's in a completely different provision of the plan. What plan did they have in mind? What provision did they have in mind? Well, that's contained in Section 4.06 of the plan, the break in service rules. Well, what you're saying is no matter what version of the plan they looked at, the break in service is going to cause a problem for Mr. Banuelos, and that's where the 501-hour issue comes up. I'm sorry, I didn't mean to point at you, but counsel says, look, forget about the 501 hours. Even with the breaks in service, I get benefits. You're saying, no, the plan didn't have to determine 5 years or 10 years, but the breaks in service, he needed 501. Until you tender me 501, you don't get anything. Precisely. And so then we run into Judge Kelleher's decision, summary judgment, where was the error of law, or why wasn't an error of law for him to proceed as he did? With that in mind, you're telling me what the trustees did. I'm not sure. When he looked at this document, okay? Judge Kelleher? Yeah. He said, I'm going to deny summary judgment. He also had in front of him what the trustees had done, the 501 hours, okay? Correct. All right? So what difference does it make, then? Why should Kelleher should have gone ahead? He should have said was, well, you need 501 hours, you don't have 501 hours, they've made a proper denial. Because if your argument holds true, the document is irrelevant at this stage. Yes, if my argument holds true. I don't know that this Court will accept that argument. Well, I'm just trying to work your argument through, because I'm trying to sort this out. It's very – and especially because we're dealing with the denial of summary judgment. I know. This is – I agree. It's horribly – I can tell just by the Court's questions how confusing this is, because the record at summary judgment is not nearly as developed as the record that was developed at trial, where Kelleher said, now I understand. That's why we have to be careful here. The plaintiff in the case, or the appellant here, was asked to provide the trial transcript. No, we're on summary judgment, so we don't have the trial transcript. That's correct. We moved for that, by the way. So we're dealing with what Judge Kelleher had. Well, he certainly had the document. Correct. He certainly had the plan that says if you have a break in service, you need to put, in this case, 501 hours. Why do we have to go any further? Is there an error of law that's – I mean, what is the legal issue here? It doesn't sound like we have a factual issue, unless there's a factual issue with regard to the 501-hour requirement, and if so, then it has to go on. If you see where I am here, I think. Yes. If you go down that path, I believe it probably was just a pure issue of law, which is that it doesn't matter whether it was in the plan or not in the plan, you lose both ways. You can't get there unless it is that way, because you're telling me it needs 501 hours, and if the plan people didn't care, because I saw what they said. You need 501 hours. Right. Right. But the – I assume, Judge Brunetti, that you're also focusing on the issue which we raise in our papers, which is the initial procedural hurdle, which is after you've had a full plenary trial on the merits, the only way you go back and address a motion for summary judgment that was denied earlier is if there was a pure issue of law. Exactly. And that's why I'm searching in the SACE Act for that issue of law that allows us to do what we're doing right now. Well, I don't – okay. If you accept our argument that Mr. Banuelos doesn't get a pension under either version of the plan, then I think it is a pure issue of law. However, if you don't, if you find he gets it under the document that Mr. Weinstock had, but doesn't get it under the document which we say represented the plan, then there is an issue of fact to be determined. Now, there's a determination of what the new so-called new document and the old plan say with regard to breaks in service. No. The break in service provisions I think you'll find in both plans is going to be identical. So that's not an issue of law, then? I mean, that's not an issue of law to worry about, is it? Well, it ties into it because of the vesting. There's another section in the plan called vesting, which is what Mr. Weinstock and Mr. Banuelos are relying on, but it cross-references the break in service rules where the 501-hour requirements. Banuelos says I'm 65, I've got over 5, I'm vested, issue of law. Correct. And I don't need a break in service. Is that issue of law? I don't need to satisfy my break in service. I don't need to cure my break in service or reinstate the credits. Is that issue of law? If the language in the plan documents, the two that are in dispute here, you determine is identical in legal effect, then I think it would probably be an issue of law. Are they identical word for word? No, they're not. I mean, that's what this case was all about, is we said the document that was given to Mr. Weinstock does not reflect the true intent of the trustees. And by the way, that's an issue of law. Now we're down the road, are we? Now we're in that issue of fact. Absolutely. And that's why the motion for summary judgment we think was properly denied. I don't think Judge Kelleher got it quite right at that stage as to what the issue of fact is. We were contending, because we start getting into the parole evidence rule here, I don't believe this case involves parole evidence. There are numerous cases from this circuit and other circuits that say you can always introduce parole evidence to show that a document was not what the parties intended or to show a forgery or to show that there was a mutual mistake. Let's go back to the original proposition. If you have a plan summary and if you have the plan and it's in conflict, then the employee under arrest can rely on the best benefit to him. Agreed. You held that in burnt. Exactly. You held that in burnt. Now we have a document that does not show on its face. For summary judgment, it's a document that was provided by the plan to this counsel. I don't care how he got it. He's got it. It's not denied that the document wasn't in the file. It's always been in the file. And you've got the plan and they're in conflict. So where's the big issue? Where is the big issue of fact that there isn't any issue of fact unless you want to say I deny that? Can you create the issue of fact by saying I don't – I deny that that's a document? Well, we deny this is the document you can rely on. There are two responses to that. You're creating an issue of fact by denying that this is a document. We're creating the issue of fact by denying that it's – by challenging the authenticity of the document. Challenging the authenticity of your own document. Well, when you say own document, that's what was explored by Kelleher at trial. No, no, no. The document didn't come out of the sky on a sky. It came from you. It was – well, let me clarify. It was actually created by the trust's counsel as an internal working tool. It was never adopted by the trustees. But they disseminated it outside. Well, no. Somebody in the trust organization disseminated it outside without authorization. And let me – let me – No, no, no. We don't know whether it was with or without authorization, do we? In the summary judgment papers, I believe you do. Mr. Miller's declaration says I never intended this to go anywhere else. And the trustee – the trustee declaration saying this was never adopted. But let me – I want to point out one – I'm not – I'm your attorney here, so what you're saying is that's a pure issue of fact. Correct. What was that document? Now, there's two indications that that document could not be relied on. And, you know, you said it's the plan. If you look at that document that's in evidence and attached, I believe, to Mr. Weinstock's declaration, there are footnotes in it. That's not part of the pension plan. There are – there are things that are lined out. Then there are things that are underlined. Then there are things that are in brackets, including some important provisions to this case. What does all that mean? So – so it looks like a draft you're trying to say. Precisely. It looks like a working document or a draft. You can't in this Court, neither Judge Kelleher nor this Court can figure out what that document means if you look at those pages with those – with those references on it. It's not the plan document. That was the issue of fact presented to Judge Kelleher. Let's stop right there. At least there was a dispute. Was it or was it not? Let's just stop right there. You're saying that even though you have a document which is the plan, the 10-year document, and you have this other stray document that comes out which appears to be a draft, because it appears that way, then there's enough to create the issue of fact. Because if it looked like – if it had stamped on it, this is a final act, could you make the same argument about intent? I think you need something – you either need board minutes by the trustees saying this is the document we've adopted, or you need it signed by the trustees. Only the trustees can amend the plan, not – not counsel. And that's the other thing I look for. I could find the official action of the trust, so that's what forced it into the trial? Exactly. This document was sent out to be relied upon. Is that correct? Well, yes. There are two very important issues there. If you look at Mr. Weinstock's letter requesting the plan, look at the response letter as well. Not only was this plan sent, he was sent the most recent printed version of the plan and all of the amendments. Mr. Weinstock was never able to produce those during the course of these proceedings, interestingly. So he got all the amendments and the plan in addition to this other document. He chose to rely on what helped him. You're saying that we have one document. You're saying that we have everything out there, but this one document was pulled out. Is that in the record in the summary judgment? If you look at the other things, that he got other things? Yes. That's in the record. That's – I can get the page if you want. It's a letter from Rochelle Asheroff in the other case called the Barrios case sending Mr. Weinstock the 1994 plan, which he chose to rely on, and the plan adopted by the trustees earlier, the official plan document, although somewhat dated, and all of the amendments. Why would he send her the 1994 plan? I don't know, Your Honor. Why would you send him that? I suppose it's a useful reference tool. Well, I suppose if I were the lawyer and there were all these other things leading up to it, and then I get the 1994 plan, can't I rely on the 1994 plan? Well, no, because it's not the official plan document. But let me address one very important issue here, which is the issue of reliance. I'm almost out of time, I see. Oh, I've got 30 seconds. You're out of time. Mr. Banuelos did not rely in any shape, way, fashion, or form on the 1994 plan. He stopped working in the industry in 1991. This plan, I'll call it the 1994 plan, the compilation, was produced in 1994 after his entire work history had been completed and he had incurred one-year breaks. Furthermore, it was not requested until 1998 in another action. Mr. Banuelos did not actually see it through his counsel until this case got filed in 1999. So nothing that this plan said or didn't say affected Mr. Banuelos's work history, his decisions to work or not work during the entire course of these proceedings. Absolutely no reliance. Stand up. Is that relevant? I think it is. I think that if you are relying on something that is not the master plan document this is the Burke doctrine. Burke says if it's the master plan document, you don't need to see it, you don't need to rely on it, because that's the instrument that governs the rights and obligations of the party. If you're going to rely on something else, like a summary plan description or something else, yes, I believe the Ninth Circuit, the better Ninth Circuit indications, I'm not sure you've addressed it squarely, are that you don't, you need to see that. Otherwise, you've got, you've got this issue of conflicting, you're going to have the summary plan description essentially displace the master plan document for all participants who haven't seen it. That's going to be a result that's going to be really unhappy. But we still don't know when the trustees sent out that letter about the, doing the extra 501 hours of work, we don't know what, what version of the plan or whether they were relying on the 1994 plan or an earlier plan. Or a later plan. Or later. But we don't know what they were relying on. No. We don't know precisely what they were looking at except their knowledge of what they had done over the years and how they had modified the plan only in response to what ERISA required. You're saying it didn't make any difference because whatever plan you looked at, you didn't come to the same result as far as Monuelos is concerned. That, well, yes, that goes to Judge Bonetti's question, which is ultimately we think you get to the same result. Because even if you rely on the provision in the 1994 plan, he would have had a break in service and he doesn't get a pension until he gets 501 hours. What about when Judge Kelleher had this matter, what about his holding a separate, you know, holding a hearing on the merits, holding a trial? What's the, where does that power stem from? I think it's an administrative matter. He's supposed to limit his decision to the record. That's what you're going to. Judge Kelleher had dealt with that in his opinion and we briefed it. The simple fact of the matter is at the time of the administrative hearing, where the, during the appeals committee process where they were looking at the application for Mr. Banuelos and Mr. Weinstock's letter, the mistake in the plan document had not been discovered. By the way, Mr. Weinstock did not submit the 1994 plan document to the trustees during that appeal. That's in the record as well. He just quoted from it. So to answer your question, we went outside. Judge Kelleher said I need to go outside the record in this case because the trustees didn't know at the time that this hearing was held, that there was a mistake in the plan and, you know, that it needed to be explained. That all occurred afterwards. That's why he went outside the administrative record on appeal. So from what you've told us earlier, it didn't make any difference anyway whether there was a mistake in the plan or not. If you accept our argument that he does not qualify under Section 407. No, no, no. You said that the 94 plan that was sent to counsel and the earlier plan, you'd get the same result. That's correct. That's our position. Well, if someone reads both those plans, would they come to the same result? I think Mr. Weinstock is going to tell you, no, you shouldn't. Our argument is yes, you should. So that's you see where I'm going? Well, the impression I got from you was that, you know, the provisions that caused the trustee to come to the trustees to come to the conclusion about working the other 501 hours, that regardless of what plan they would have looked at, they would come to the same result. So I'm assuming from that that the language is identical. The break-in-service language is identical in the two. But there's another section of the plan entitled Vesting, which contains Section 4.07e that cross-references to the break-in-service rules. That's the provision that Mr. Banuelos is relying on. That's the provision that we say was included in error in the plan. But even if it was included in error. What about the 10 years versus 5 years? Well, I think in the plan document that Mr. Weinstock received, there's an ambiguity as to how much credit was required. As a matter of current law, once a participant reaches age 65 under ERISA and he has unbroken credits, he vests those credits no matter how little he's got, but only under the ERISA plan. So even if he's only got 2 years, as long as he doesn't have a break, he turns age 65, he gets the pension based on 2 years. Well, he'd have to start when he's 63, huh? Exactly. Which, as Judge Fredersen, in your background, I know your work is labor. It's back-breaking work. You don't find many of them doing it at age 63. No, but I'm just wondering what's happened to this money. You know, how is it administered? Well, it's administered according to the rules of the plan, which tell you who gets pensions and who don't. And, yes, there are some people who don't get pensions, even though contributions have been made on their behalf to the plan. Who made those contributions? The employer. The employer does. Yes, the employer. Yes, the employer makes those. Yes, the employer funds those contributions. And they stay in the trust for the benefit of the other people who do qualify. Well, I think we've heard enough. Yeah, we've heard enough. Okay. I'm sorry to run over your honors, but I wanted to respond to your questions. Thank you. Yeah. Does that include hearing enough from me, or would you like to say something? No. Rupert, you've got a lot of time now. Okay. Thank you. Mr. I want to go back. Excuse me just a second. I want to go back and discuss some of the things Mr. Nonaman said, because one of them suggested that I picked out what I wanted to show to the judge below in the summary judgment motion. I picked this out, and this was the good document. The others were bad documents. That's just not true. There's no declaration in the summary judgment motion. Mr. Weinstock picked these documents out. Here's really what we sent him, all this other stuff. In point of fact, I think you'll see the major document received was the 1994 plan. It consisted of, I don't know, 100 pages or so, and then there was a few other amendments and an original plan that was maybe 15 or 20 years old. I could just ask the court, you've all been in practice, if you receive a document and it purports to be a plan of some sort and it's in response to what you've requested, don't you just naturally assume that that's the document purports to be what it says it is? Mr. Nahneman also made points. Well, this had footnotes in it. Footnotes. Oh, I get documents with footnotes all the time. That doesn't mean they're inauthentic. What about underlinings? Underlinings, that's not a big deal. It would appear that those underlinings simply highlighted what recent amendments were, as, in fact, we had with Section 4.07E. It was underlined, and then there was a footnote that says 93-1P, and it says 93-1P, 93-1P, effective 2-28, and I think that's at the end. Oh, these two sentences were added by the plan by amendment number 93-10P. Well, all I can say is the footnotes all correspond to what amendments. Now, I don't know about you, but I would much rather read an integrated document. I don't go through the United States Code, for example, and go to the original source and then look at all the amendments that have made to the ERISA laws. It's just very difficult to do. I like to look at an integrated document. If it has footnotes, so much the better. I can see where the amendments occurred. If it has underlinings and these seem to relate to those amendments, again, so much the better. I can understand the document a lot better. Now, the other thing I want to raise is Mr. Nonaman says that he says now, which I did not see as an argument in the court below, even if 4.07E, Section E, is the I think it's going to be really necessary for you to look at that section, look at Mr. Vonnewellos' record, and decide for yourself whether he has that service requirement. I do not believe he does. I don't think so. The section, let's read it. An employee who has accumulated five years of credit services computed as provided in 4.04A and 4.06, parenthesis two, is 65 years or older, and three, has not had a break in service during the period referenced in one above, shall have a vested pension. Well, he doesn't have a break in service during the period, that five-year period, because after he's worked his five years, he has all those breaks in services have rehabilitated. So he's got a five-year period without a break in service, without a break in service that would cause him to have to work another 501 hours. It's just common sense that that's what it means, because if it meant anything else, as Justice Brunetti pointed out, the trial court, Judge Kelleher would have said, he still has to work 501 hours. Now, addressing the issue of, well, what was actually before the trustees in this case? What did they decide it on? Well, we submitted the section that they either decided on or should have decided it on. If they did not want to decide it on that section, that is, section 4.07E, they should have told us by written communication. They should have had a hearing. They should have said, by God, this isn't the section that applies in this case. So then what did they decide it upon? I think they simply said, well, five-year vesting, there's no five-year vesting in these plans. We know that. We don't need to look at the documents. So what? So Mr. Weinstock submitted this thing. Well, there's no five-year vesting. End of story. We'll just deny it. There's no five-year vesting. That's how I think they decided it. I don't think they bothered looking at any plans. As you can see, there's a certain, I think, a certain level of sloppiness. We have them saying, well, we made mistakes. We didn't read the minutes. Somebody initialed something that was a second reading that should not have been a second reading. Oh, by the way, we accidentally sent out an amended plan that's dated 1994 that shouldn't have gone on. Well, wait a minute. You're way down the line. You're in the merits. If we're going to get the merits, we can just look at that. But you didn't appeal that. I think that was not in the summary judgment. Right. So we're back to square one. I mean, if you're starting to bring in stuff that was at the trial and you didn't appeal that, I'm, again, very lost. Well, I am just going to the summary judgment. Because what it's doing is confusing how we're supposed to now get here, because all we can look at is an error block. That's correct. The stuff about who said what and what was there is not in this case. Right. So I think what you look at is you look at Section 4.07e. You look at that section. You read it thoroughly. You look at Mr. Bonnewell's record, his work record. That's all in the record. These cases really should be decided on written documents. And that's all we're trying to, I'm trying to have you decided on. 4.07e, it's in the record. It's a legitimate document. Mr. Bonnewell's record, how many years he worked, when he started to work, when he got a thousand hours and so forth, that's all in the record, and that's what you should decide the case based upon. If there are no other questions, I'll submit the case. Thank you very much. The matter submitted was the final matter, Diamond v. Osborne. Thank you. All right.
judges: B. Fletcher, Pregerson, Brunetti